**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Case No.   **21-cr-34-WJM**

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.    MICHAEL SHAWN STEWART, and
2.    BRYANT EDWIN SEWALL,

      Defendants.

---

**INDICTMENT**

---

The Grand Jury charges that:

## COUNTS 1-14
### 18 U.S.C. § 1343

**The Scheme**

1.  Beginning in at least late 2015 and continuing until at least September 2019, in the State and District of Colorado and elsewhere, defendants MICHAEL SHAWN STEWART ("STEWART") and BRYANT EDWIN SEWALL ("SEWALL") devised and intended to devise a scheme to defraud and to obtain money and property from investors by means of materially false and fraudulent pretenses, representations, and promises by obtaining from investors money for the purpose of investing in algorithm-based trading in foreign currency exchange ("FOREX") markets (hereinafter referred to as "the Scheme").  It was part of the Scheme that:

1

2.  From at least early 2016 through at least September 2019, STEWART, SEWALL, and a third business partner owned and operated Mediatrix Capital, Inc. ("Mediatrix") for the purpose of soliciting investor funds for the algorithm-based FOREX trading and to act as an investment advisor in connection with such FOREX trading;

3.  From at least early 2016 through at least September 2019, through Mediatrix, STEWART, SEWALL, and a third business partner offered investors two programs for FOREX trading: individually managed accounts ("Managed Accounts") and a pooled fund (the "Fund").  The vast majority of investor money was invested through the Managed Accounts program.

4.  In marketing materials provided to investors and potential investors, STEWART was described at different times as the Managing Director, a Founder, and the Chief Operating Officer of Mediatrix and SEWALL was described as the Executive Vice President of Operations, the Chief Technology Officer, and Lead Trade Manager of Mediatrix.

5.  From at least late 2015 through September 2019, the third business partner lived predominantly in Colorado and maintained an office in Colorado from which he conducted business on behalf of Mediatrix.  In marketing materials, this third business partner was described at different times as the Chief Executive Officer, Chief Operating Officer, and a Founder of Mediatrix.  This third business partner had primary responsibility for marketing Mediatrix's FOREX trading programs to investors and potential investors, and he met with a number of investors in Colorado.

6.  From at least early 2016 through September 2019, STEWART and SEWALL caused this third business partner to provide false and misleading information to investors and potential investors.

7.  From at least late 2015 through at least September 2019, STEWART, SEWALL, and a third business partner had majority ownership of and operated Blue Isle Markets, Inc. and Blue Isle Markets Limited (collectively "Blue Isle") for the purported purpose of acting as an intermediate broker between Mediatrix's investors and its brokerage firm where the FOREX trading took place. Mediatrix's investors were directed to wire funds to bank accounts held by either Blue Isle or Mediatrix.  STEWART then caused some of those funds to be sent to brokerage accounts held at Mediatrix's actual brokerage firm.

8.  Despite the fact that Mediatrix and Blue Isle were owned and operated by the same three individuals, Mediatrix documents provided to investors and potential investors falsely created the impression that these were unaffiliated and distinct entities performing different services for which they would be entitled to collect distinct fees.  This common ownership was not disclosed under the "Potential Conflicts of Interest" section of the materials provided to investors and potential investors.

9.  From at least early 2016 through at least September 2019, STEWART and SEWALL falsely represented, and caused to be falsely represented, to investors and potential investors that STEWART and SEWALL had developed proprietary trading algorithms for successful FOREX trading.

10. From at least early 2016 through late 2018, STEWART and SEWALL falsely represented, and caused to be falsely represented, to investors and potential investors that Mediatrix had a history of successful FOREX trading dating back to December 2013 with no months in which Mediatrix incurred net losses when, in fact, Mediatrix never traded prior to 2015 and its trading history included many months in which net losses were incurred.

11. From at least early 2016 through September 2019, through Mediatrix's marketing materials, STEWART and SEWALL caused to be falsely represented to investors and potential investors that Mediatrix's FOREX trading program offered "100% Transparency" and "World Class Returns."

12. From at least early 2016 through September 2019, STEWART and SEWALL falsely represented, and caused to be falsely represented, to investors and potential investors that Mediatrix's supposedly successful trading history had been audited and verified by third parties.

13. From at least early 2016 through September 2019, STEWART and SEWALL provided, and caused to be provided, to investors and potential investors falsely inflated figures regarding the amount of money that Mediatrix had under its management, also referred to as "Assets Under Management" or "AUM," in order to support and bolster their false representations about Mediatrix's successful trading history and to make Mediatrix appear more successful than it was.

14. From at least early 2016 through September 2019, STEWART and SEWALL falsely represented, and caused to be falsely represented, to investors and potential investors that the fees charged to investors by Mediatrix would be

predominately driven by successful trading and overall gains to an investor's account.  As set forth in the marketing materials and investor documents, the Managed Account program was only supposed to be subject to a monthly performance fee at a rate that ranged from 35% to 50%, depending on the account, of any net profits above the initial investment amount and then subsequent "high water marks."  A "high water mark" was defined by Mediatrix as the balance in the investor's account after net profits (from which performance fees had already been taken) were added.  If the account then lost money, new performance fees would not be charged until the account's balance rose above the prior "high water mark."

15. From at least early 2016 through September 2019, STEWART and SEWALL caused false and misleading daily and monthly account statements to be sent to investors that showed that the investors' accounts were earning money through successful trading and that their account balances were growing.

16. From at least early 2016 through September 2019, using the false and misleading monthly account statements, STEWART and SEWALL caused Mediatrix to charge investors monthly performance fees despite the fact that investors were losing money.

17. From at least early 2016 through September 2019, STEWART and SEWALL caused Blue Isle to charge Mediatrix's investors a "markup" fee on top of the price of each FOREX trade that was conducted—whether it was a profitable or losing trade.

18. From March 2016 through September 2019, investors sent more than $129 million dollars to bank accounts held by Blue Isle and Mediatrix for the purpose of investing in algorithm-based FOREX trading with Mediatrix.  During that time:

   a. Trade losses in excess of $32 million occurred;

   b. STEWART, SEWALL, and a third business partner spent more than $40 million on personal and business expenses; and

   c. Approximately $39 million was returned to some investors in the form of supposed profits and a return of principal investments.

19. In furtherance of the Scheme and via interstate wires in the form of emails, STEWART and SEWALL sent, and caused to be sent, marketing materials and disclosure documents, investment contracts and related documents, investor correspondence and newsletters, daily and monthly investor account statements, and communications between STEWART, SEWALL, and a third business partner.

20. Also in furtherance of the Scheme, STEWART and SEWALL sent, and caused to be sent, money transfers via interstate wires.

**Execution of the Scheme**

21. For purposes of executing the Scheme described in paragraphs 1 through 20 above, on or about the dates listed below, defendants STEWART and SEWALL caused to be transmitted by means of wire communication in interstate and foreign commerce the writings, signs, signals, pictures and sounds set forth below.

| Count | Date | Description of Wire |
|---|---|---|
| 1 | 3/9/16 | $20,000 was wire transferred from an account held by L&L Enterprises International, LLC at JP Morgan Chase to Blue Isle's account at Česká Spořitelna. |
| 2 | 5/20/16 | $30,000 was wire transferred from an account held by L&L Enterprises International, LLC at JP Morgan Chase to Blue Isle's account at Česká Spořitelna. |
| 3 | 1/24/17 | $100,000 was wire transferred from an account held by D.S. at JP Morgan Chase to Blue Isle's account at Česká Spořitelna. |
| 4 | 2/23/17 | $30,000 was wire transferred from an account held by L&L Enterprises International, LLC at JP Morgan Chase to Blue Isle's account at Česká Spořitelna. |
| 5 | 9/8/17 | $100,000 was wire transferred from an account held by S.H. at UMB to Blue Isle's account at Česká Spořitelna. |
| 6 | 11/10/17 | $1,000,000 was wire transferred from an account held by S.B. at JP Morgan Chase to Blue Isle's account at Česká Spořitelna. |
| 7 | 12/5/17 | $500,000 was wire transferred from an account held by S.B. at JP Morgan Chase to Blue Isle's account at Česká Spořitelna. |
| 8 | 12/15/17 | $50,000 was wire transferred from an account held by K.H. at Wells Fargo to Blue Isle's account at Česká Spořitelna. |
| 9 | 2/13/18 | $500,000 was wire transferred from an account held by Garmat USA LLC at CoBiz Private Bank to Blue Isle's account at Česká Spořitelna. |
| 10 | 8/17/18 | $100,000 was wire transferred from an account held by Payfurther 401K Trust at Wells Fargo to Mediatrix's account at Ansbacher (Bahamas) Ltd. |
| 11 | 11/2/18 | $1,000,000 was wire transferred from an account held by R.J.P. Living Trust to Blue Isle's account at Česká Spořitelna. |
| 12 | 1/29/19 | $50,000 was wire transferred from an account held by R.J.P. Living Trust to Blue Isle's account at Česká Spořitelna. |
| 13 | 2/8/19 | $100,000 was wire transferred from an account held by C.W. at Redstone Bank to Mediatrix's account at Ansbacher (Bahamas) Ltd. |
| 14 | 3/11/19 | $250,100 was wire transferred from an account held by M.W. at JP Morgan Chase to Blue Isle's account at Česká Spořitelna. |

All in violation of Title 18, United States Code, Section 1343.

## COUNT 15
## 18 U.S.C. § 371

22. From in or about late 2015, and continuing until on or about September 2019, in the State and District of Colorado and elsewhere, defendants MICHAEL SHAWN STEWART and BRYANT EDWIN SEWALL knowingly and voluntarily conspired and agreed together and with each other to commit an offense against the laws of the United States, namely, wire fraud, in violation of Title 18, United States Code, Section 1343.

### The Manner and Means of the Conspiracy

23. Acting interdependently, the defendants carried out the conspiracy, in part, using the following manner and means:

   a. Paragraphs 2 through 20 of this Indictment are incorporated fully herein by this reference.

### Overt Acts

24. In furtherance of the conspiracy's objective, one or more of the conspirators committed one or more of the following acts in the State and District of Colorado and elsewhere:

   a. On or about February 25, 2016, STEWART opened bank accounts at Česká Spořitelna, a bank operating in the Czech Republic, under the name Blue Isle Markets, Inc. for the purpose of receiving money from Mediatrix investors.

   b. On or about March 22, 2016, STEWART opened additional bank accounts at Česká Spořitelna under the name Blue Isle Markets, Inc. for the purpose of receiving money from Mediatrix investors.

c.  On or about April 28, 2016, STEWART sent an email to his third business partner in which STEWART stated, "He's talking about how the PAMM only allocates the winning trades.  Bryant is working on changing over the accounts so they show all allocations but it's the PAMM not us."

d.  On or about April 28, 2016, STEWART sent an email to investor J.H. in which STEWART stated: "Mediatrix[] and BIFX set up a PAMM that allocates only closed trades to the clients due to the pricing model they have. Therefore they (Mediatrix) are holding all the risk and assigning the profits/losses of all closed trades accordingly to each Managed Account. Any Open Trades are held on their internal Master Book only so the client doesn't have any open equity positions.  Because they have such a small and limited equity use of 15% of the account balances, rather than an Open Equity Model, the risk is so low they are able to carry the trades on their own book. Now if there is a losing trade they will also allocate those across the account as they have a few times already.  So as it stand[s] now the clients do not hold any open positions, only the Master Omnibus Account for MC.  Therefore the gains are a true gain to each client."

e.  On or about June 6, 2016, STEWART sent an email to a company that published Mediatrix's purported trade result history and instructed that company to delete Mediatrix's 2015 trade results that had previously been provided under Mediatrix's prior FOREX trade program.

f.  On or about September 8, 2016, STEWART sent an email to his third business partner, attaching a Power Point Presentation regarding

Mediatrix that contained false and misleading information which STEWART intended to be used during a presentation at a conference on or about September 19, 2016.

g.  On or about October 26, 2016, STEWART and SEWALL participated in opening a bank account at Ansbacher (Bahamas) Ltd under the name Mediatrix Fund Ltd for which they were both listed as "authorized signatories" on the account.

h.  On or about October 10, 2017, SEWALL sent STEWART a WhatsApp message that said: "I estimate we would increase rebates by 35 to 40k a day if all this capital was on the UK side.  40k a day x 22 trading days = 880k. Say I'm off by 20% and it goes up only 30k a day, 660k a month[.]"

i.  On or about October 15, 2017, SEWALL sent STEWART a WhatsApp message about their third business partner in which SEWALL said, "[W]e don't need him poking around in ops… He is not the boss. His title as CEO is r[i]diculous.  He is the marketing guy and needs to stay in that realm and exercise client management.  He said a few things I very much want to discuss because he seems to be struggling mightily with credibility of our system in his marketing.  Hurdles we should be able to start overcoming at this point."

j.  On or about October 16, 2017, SEWALL sent STEWART a WhatsApp message that said: "Ok. Good day for most part[.] Out of most nzd trades but got shit fills on the nzdjyp so turned winners into losers again so jumped on Gary to figure that shit out."

k.  On or about March 7, 2018, in response to a question by his third business partner regarding whether Mediatrix had $110 million in Assets Under Management, STEWART sent an email falsely answering, "Not quite but it rounds up."

l.  On or about May 26, 2018, SEWALL sent an email to his third business partner, with a cc to STEWART, in which SEWALL falsely touted Mediatrix's track record of "53 months of gains and no reason EVER relevant to be concerned."

m.  On or about June 12, 2018, STEWART sent an email to investor S.C. in which STEWART stated in response to S.C.'s question about his account's inactivity: "There is a method to our madness and if you could please take a step back and look at a bigger picture, your anxiety will calm down. Bryant and I speak multiple times a day on yours and all other accounts. We methodically go through what is ready and what is not, what needs to be adjusted and what does not. What I can tell you is that there is no reason to be concerned, there is no reason to worry and this business is not one to make quick indecisive decisions. We have to look at the larger picture each day and plan for the next week, the next month and longer."

n.  On or about July 2, 2018, STEWART sent SEWALL a WhatsApp message that said: "S. got a Negative GBP month end statement."

o.  On or about July 2, 2018, SEWALL responded to STEWART with a WhatsApp message that said: "I told them to check it. They assured me there would be no negative statements because they restored it."

p.  On or about July 26, 2018, STEWART sent an email to his third business partner in which STEWART provided a false and misleading summary regarding his sanction by the CFTC in or about 2001, intending that this false summary be shared with investors and included in Mediatrix's disclosure documents.

q.  On or about September 6, 2018, STEWART sent SEWALL sequential WhatsApp messages that said: "We have about ½ the accounts showing negative for aug," and "Trying to figure out why."

r.  On or about September 13, 2018, SEWALL sent STEWART a WhatsApp message that said: "Any idea on these deposits? These limits are strangling us. I could exit all chfjyp in AM book in profit, if I had some space. We miss so many opportunities to close trades. So frustrating[.]"

s.  On or about September 13, 2018, STEWART responded to SEWALL with sequential WhatsApp messages that said: "Should have 3 mil mon/tue" and "Then another 2 later in the week[.]"

t.  On or about October 9, 2018, STEWART sent an email to his third business partner with the following answer to provide in response to an investor's question about why investor statements only include closed trades: "Daily Performance to the client for reporting purposes is a Daily Closed P&L. Because we use such low equity and with 300+ clients

allocated profits via a PAMM on an ALGO System, we are required to give our clients a Closed Equity Balance P&L each Day. With only a small portion of Long-Term Trades open at any time (less than 5% of our trades), and with a positive open equity balance, compliance requires we offer our clientele a full redeemable Account Balance each day at the NY Close. If a client wishes to close his/her account on any given day, that days ending balance will be what they receive. This is offered for the safety of the client and also offers MC the ability to shield its ALGO's from reverse engineering and hackers."

u.   On or about November 28, 2018, STEWART sent an email to P.G. in which STEWART stated, "GT was hired to audit the [F]und account, not Blue Isle.  We do not own Blue Isle and can only supply what we've given."

v.   On or about May 13, 2019, STEWART sent an email to his third business partner providing the following responses to the listed investor questions: (a) "'Could you again explain your relationship to Blue Isle Markets and why you are not dealing with the typical large prime brokers'? Large Prime Brokers are market makers and play games with the trade data a price streams when a client tends to win more than they do. We employed a strategy with Blue Isle to ensure that we always have True ECN Pricing with no market maker interference and a true pricing model with control over our liquidity. By employing Blue Isle we're able to ensure we only get True[] Pricing with no manipulation for outside sources. Blue Isle allows us

to control our own direct lines into our liquidity pool with no competing parties and negotiated pric[]ing on large trade sizes.  It is a key to our trading success[;]" and (b) "To which extent are trading costs relevant for your strategy? All trading costs are built into the spread.  We pay a flat $6.00 per million to our Prime Broker and pass the institutional spread on[ ]to the client. This has enabled us to trade without interference and no worry [about] price manipulation."

    w.  On or about September 20, 2019, STEWART sent SEWALL a WhatsApp message stating: "Patrick is running all numbers through PowerBI and shows 46mil total in markup revenue[.]"

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATION

25. The allegations contained in Counts One through Fifteen of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

26. Upon conviction of the violations alleged in Counts One through Fifteen of this Indictment involving the commission of violations of Title 18, United States Code, sections 1343 and 371, defendants MICHAEL SHAWN STEWART and BRYANT EDWIN SEWALL shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c) any and all of the defendants' right, title and interest in all property

constituting and derived from any proceeds the defendants obtained directly and indirectly as a result of such offense, including, but not limited to:

    a.  Real property located at Mira Mar Villas, #15 Garden Drive, Paradise Island, Bahamas;

    b.  Real property located at 704 Ocean Place Condominiums, Paradise Island, Bahamas;

    c.  All funds held in account number 2003719.01 at Ansbacher (Bahamas) Ltd., held in the name of Mediatrix Capital Fund Ltd.;

    d.  All funds held in account number 1007557881 at Global Fidelity Bank Ltd., held in the name of Blue Isle Markets Inc;

    e.  All funds held in account number 1007557882 at Global Fidelity Bank Ltd., held in the name of Blue Isle Markets Inc;

    f.  All funds held in Equiti Capital UK Ltd., brokerage account number 70160, held in the name of Blue Isle Markets Inc.;

    g.  All funds held in Equiti Capital UK Ltd., brokerage account number 70166, held in the name of Blue Isle Markets Inc.;

    h.  All funds held in Equiti Capital UK Ltd., brokerage account number 70167, held in the name of Blue Isle Markets Inc.;

    i.  All funds held in Advanced Markets (UK) Limited, brokerage account BLUEISLE_WL, held in the name of Blue Isle Markets Inc.;

    j.  All funds held in Advanced Markets (UK) Limited, brokerage account BLUEISLE2_WL, held in the name of Blue Isle Markets Inc.; and

    k.  A money judgment in the amount of proceeds obtained by the conspiracy and scheme, and by the defendants.

27. If any of the property described above, as a result of any act or omission of the defendants:

    a.  cannot be located upon the exercise of due diligence;

    b.  has been transferred or sold to, or deposited with, a third party;

    c.  has been placed beyond the jurisdiction of the Court;

    d.  has been substantially diminished in value; or

    e.  has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendants up to the value of the forfeitable property.

                           A TRUE BILL:

                           <u>Ink signature on file in Clerk's Office</u>
                           FOREPERSON

JASON R. DUNN
UNITED STATES ATTORNEY
s/  <u>*Pegeen D. Rhyne*</u>
By: Pegeen D. Rhyne
Assistant United States Attorney
1801 California Street, Suite 1600
Denver, CO 80202
Phone: (303) 454-0100
Fax: (303) 454-0402
pegeen.rhyne@usdoj.gov