I, Tyson Polski, being duly sworn, state as follows:

## INTRODUCTION

1.     I am a Senior Inspector with the United States Marshals Service (USMS), having been duly appointed since June 2014, and as such, am a Federal Law Enforcement Officer within the meaning of Rule 41(a) of the Federal Rules of Criminal Procedures.

2.     I have completed the Basic Deputy United States Marshal Training Program and the Criminal Investigation Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia.  I have investigated and apprehended fugitives wanted by federal and state law enforcement agencies and participated in surveillance operations in relation to fugitive investigations.

3.     I have been involved with the identification and seizure of real property and other assets subject to forfeiture.  Currently, your affiant is assigned as an Asset Forfeiture Financial Investigator for the USMS at the United States Attorney's Office (USAO) in the District of Colorado.

4.     These duties include but are not limited to the identification of assets subject to seizure and forfeiture; organizing, reviewing, and analyzing financial records; providing support on investigations that have a potential for asset forfeiture; and the identification of assets to satisfy outstanding forfeiture money judgments.

5.     I have also received training in financial investigative techniques from the Department of Justice Money Laundering and Asset Recovery Section.  The course provided advanced training investigative techniques used to investigate Money Laundering and Bank Secrecy Act violations and identifying assets subject to criminal and civil forfeiture.  I obtained a Bachelor of Arts degree in Criminology from the University of South Florida in 2011 and a Master of Business Administration from Golden Gate University in 2016.

## PROPERTY TO BE RESTRAINED

6.     This affidavit is made in support of an application for an order to restrain real property purchased with investor funds constituting fraud proceeds, specifically:

    a. Odessa Oblast, Ovidiopol Region, Lymanka, Zhemchuzhna Street., r/a "Druzhnyi", Building 1-A, Apartment 224 (the "Lymanka Apartment"), legally described as:

        Одеська обл., Овідіопольський р., с. Лиманка, вулиця Жемчужна, ж/м "Дружний", будинок 1а, квартира 224.

1

b. Kyiv, Velyka Vasylkivska Street, Building 40, Apartment 11 (the "Kyiv Apartment"), legally described as:

м.Київ, вулиця Велика Васильківська, будинок 40, квартира 11.

## FACTS SUPPORTING PROBABLE CAUSE

### UNDERLYING CRIMINAL CONDUCT

7.     On February 4, 2021, a Federal Grand Jury indicted Michael Shawn Stewart ("Stewart") and Bryant Edwin Sewall ("Sewall") (collectively with Stewart the "Defendants") on fourteen counts of wire fraud in violation of 18 U.S.C. § 1343 and one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 371.

8.     As is more fully set forth in the Indictment, beginning in at least late 2015 and continuing until at least September 2019, in the State and District of Colorado and elsewhere, Defendants devised and intended to devise a scheme to defraud and to obtain money and property from investors by means of materially false and fraudulent pretenses, representations, and promises by obtaining from investors money for the purpose of investing in algorithm-based trading in foreign currency exchange ("FOREX") markets (hereinafter referred to as "the Scheme").

9.     From at least early 2016 through at least September 2019, Stewart, Sewall, and a third business partner, M.Y., owned and operated Mediatrix Capital, Inc. ("Mediatrix") for the purpose of soliciting investor funds for the algorithm-based FOREX trading and to act as an investment advisor in connection with such FOREX trading;

10.     From at least early 2016 through at least September 2019, through Mediatrix, Stewart, Sewall, and M.Y. offered investors two programs for FOREX trading: individually managed accounts ("Managed Accounts") and a pooled fund (the "Fund"). The vast majority of investor money was invested through the Managed Accounts program.

11.     In marketing materials provided to investors and potential investors, Stewart was described at different times as the Managing Director, a Founder, and the Chief Operating Officer of Mediatrix and Sewall was described as the Executive Vice President of Operations, the Chief Technology Officer, and Lead Trade Manager of Mediatrix.

12.     From at least late 2015 through September 2019, M.Y. lived predominantly in Colorado and maintained an office in Colorado from which he conducted business on behalf of Mediatrix.  In marketing materials, M.Y. was described at different times as the Chief Executive Officer, Chief Operating Officer, and a Founder of Mediatrix.  M.Y. had

2

primary responsibility for marketing Mediatrix's FOREX trading programs to investors and potential investors, and he met with a number of investors in Colorado.

13.     From at least early 2016 through September 2019, Defendants caused M.Y. to provide false and misleading information to investors and potential investors.

14.     From at least late 2015 through at least September 2019, Stewart, Sewall, and M.Y. had majority ownership of and operated Blue Isle Markets, Inc. and Blue Isle Markets Limited (collectively "Blue Isle") for the purported purpose of acting as an intermediate broker between Mediatrix's investors and its brokerage firm where the FOREX trading took place. Mediatrix's investors were directed to wire funds to bank accounts held by either Blue Isle or Mediatrix. Stewart then caused some of those funds to be sent to brokerage accounts held at Mediatrix's actual brokerage firm.

15.     Despite the fact that Mediatrix and Blue Isle were owned and operated by the same three individuals, Mediatrix documents provided to investors and potential investors falsely created the impression that these were unaffiliated and distinct entities performing different services for which they would be entitled to collect distinct fees. This common ownership was not disclosed under the "Potential Conflicts of Interest" section of the materials provided to investors and potential investors.

16.     From at least early 2016 through at least September 2019, Defendants falsely represented, and caused to be falsely represented, to investors and potential investors that Defendants had developed proprietary trading algorithms for successful FOREX trading.

17.     From at least early 2016 through late 2018, Defendants falsely represented, and caused to be falsely represented, to investors and potential investors that Mediatrix had a history of successful FOREX trading dating back to December 2013 with no months in which Mediatrix incurred net losses when, in fact, Mediatrix never traded prior to 2015 and its trading history included many months in which net losses were incurred.

18.     From at least early 2016 through September 2019, through Mediatrix's marketing materials, Defendants caused to be falsely represented to investors and potential investors that Mediatrix's FOREX trading program offered "100% Transparency" and "World Class Returns."

19.     From at least early 2016 through September 2019, Defendants falsely represented, and caused to be falsely represented, to investors and potential investors that Mediatrix's supposedly successful trading history had been audited and verified by third parties.

20.     From at least early 2016 through September 2019, Defendants provided, and caused to be provided, to investors and potential investors falsely inflated figures regarding the amount of money that Mediatrix had under its management, also referred to as "Assets Under Management" or "AUM," in order to support and bolster their false representations about Mediatrix's successful trading history and to make Mediatrix appear more successful than it was.

21.     From at least early 2016 through September 2019, Defendants falsely represented, and caused to be falsely represented, to investors and potential investors that the fees charged to investors by Mediatrix would be predominately driven by successful trading and overall gains to an investor's account.  As set forth in the marketing materials and investor documents, the Managed Account program was only supposed to be subject to a monthly performance fee at a rate that ranged from 35% to 50%, depending on the account, of any net profits above the initial investment amount and then subsequent "high water marks."  A "high water mark" was defined by Mediatrix as the balance in the investor's account after net profits (from which performance fees had already been taken) were added.  If the account then lost money, new performance fees would not be charged until the account's balance rose above the prior "high water mark."

22.     From at least early 2016 through September 2019, Defendants caused false and misleading daily and monthly account statements to be sent to investors that showed that the investors' accounts were earning money through successful trading and that their account balances were growing.

23.     From at least early 2016 through September 2019, using the false and misleading monthly account statements, Defendants caused Mediatrix to charge investors monthly performance fees despite the fact that investors were losing money.

24.     From at least early 2016 through September 2019, Defendants caused Blue Isle to charge Mediatrix's investors a "markup" fee on top of the price of each FOREX trade that was conducted—whether it was a profitable or losing trade.

25.     From March 2016 through September 2019, investors sent more than $129 million dollars to bank accounts held by Blue Isle and Mediatrix for the purpose of investing in algorithm-based FOREX trading with Mediatrix.  During that time:

   a.  Trade losses in excess of $32 million occurred;

   b.  Stewart, Sewall, and M.Y. spent more than $40 million on personal and business expenses; and

   c.  Approximately $39 million was returned to some investors in the form of supposed profits and a return of principal investments.

4

26.     Investor funds were initially deposited into multiple foreign accounts controlled by Blue Isle and Mediatrix.  Some of those funds were then used to purchase the Lymanka Apartment and the Kyiv Apartment.

## FINANCIAL ANALYSIS

### Hannah Ohonkova Sewall's Income

27.     As part of my investigation, I reviewed the transcript of the October 8, 2019 Telephonic Deposition of Hanna Ohonkova Sewall in *SEC v. Mediatrix Capital Inc., et al.* Hannah Ohonkova Sewall ("Ohonkova") is Sewall's wife.

28.     According to Ohonkova's deposition testimony, she was born in 1993 in Ukraine.  After obtaining a bachelor's degree in English from the University of Ukraine, Ohonkova took a job as an au pair in Vienna, Austria.  Ohonkova first met Sewall while she was an au pair in Vienna, using a dating website.  Their first in-person meeting was in 2014/2015, when Ohonkova flew to Stuttgart, Germany, for the purpose of meeting Sewall.  After their first in-person meeting, Ohonkova and Sewall spoke weekly, went on several trips together, and were married on September 2, 2017, in the Bahamas.  From 2016–August of 2019, Ohonkova's only source of income (other than funds provided by Sewall) was a small tailoring business she operated.  However, that business generated less than $1000 per month, which was primarily reinvested into the business to attempt to grow it.

### Facilitating Česká Spořitelna Account #6849312

29.     Česká spořitelna a.s. ("Česká spořitelna") account ending in #9312 (Česká #9312) is a bank account operated in the Czech Republic, held by Blue Isle Markets Inc. This account was opened on March 22, 2016.  Michael Stewart is signer on the account.

30.     Česká #9312 was funded by the following transactions between March 2016 and April 2018, totaling over $67.8 million in investor funds:

a. Approximately $57,530,684 investor funds wired directly from investors in the United States and foreign countries;

b. Approximately $3,639,415 in transfers from a Česká spořitelna account held by Blue Isle Markets Inc. ending in 3192, which received a total of approximately €4,592,723 (EUR) in investor funds.

c. Approximately $119,058.00 in a single transfer from a Česká spořitelna account held by Blue Isle Markets Inc. ending in 9582, on April 4, 2018, which was solely funded with $202,102 in fund transfers from other Česká

spořitelna accounts (held by Blue Isle Markets Inc.) holding investor funds; and

d. Approximately $6,532,330 from Equiti Capital UK Ltd. brokerage accounts, which had received investor funds.

31.     No other significant source of deposits funded Česká #9312.

32.     Transfers from Česká #9312 include, but are not limited to, transfers relevant to the flow of investor funds to the purchase of the Lymanka Apartment and the Kyiv Apartment.  More particularly:

a. Approximately $1,528,479.00 were transferred to other Česká spořitelna accounts held by Blue Isle Markets Inc.; and
b. Approximately $48,000.00 to PJSC CB PrivatBank account #5168757290811464, held by Ohonkova.

**Facilitating PJSC CB Privatbank Account #5168757290811464**

33.     PJSC CB PrivatBank ("PrivatBank") account #5168757290811464 (Privat #1464) is a bank account held in Ohonkova's name.  Account records provided by the Prosecutor General of Ukraine for Privat #1464 show that between May 30, 2017 and June 6, 2017, Privat #1464 received €40,795—approximately $46,000—from Česká #9312.

34.     Prior to the first deposit from Česká #9312 into Privat #1464 on May 30, 2017, Privat #1464's account balance was €9.95.

35.     Account records show that Privat #1464 was funded by the following transactions from Česká #9312 between May 30, 2017, and June 6, 2017, which totaled €40,795.00 (approximately $46,000):

- On May 5, 2017, Privat #1464 received €1,990 from Česká #9312;
- On June 2, 2017, Privat #1464 received €8,955 from Česká #9312; and
- On June 6, 2017, Privat #1464 received €29,850 from Česká #9312.

36.     Account records show that between June 6, 2017, and June 13, 2017, Ohonkova made the following five large cash withdrawals, which totaled €40,520, or approximately $45,000:

- On June 6, 2017, Ohonkova withdrew €8,000 from Privat #1464;
- On June 8, 2017, Ohonkova withdrew €8,000 from Privat #1464;
- On June 9, 2017, Ohonkova withdrew €8,200 from Privat #1464;

6

- On June 12, 2017, Ohonkova withdrew €8,200 from Privat #1464; and

- On June 13, 2017, Ohonkova withdrew €8,120 from Privat #1464.

37.     Account records show that after the withdrawal of €8,120 on June 13, 2017, Privat #1464's account balance was €284.95.

## Lymanka Apartment

38.     Ohonkova purchased the Lymanka Apartment on June 13, 2017. The Lymanka Apartment is titled to Ohonkova.

39.     According to Ohonkova's sworn deposition testimony, the Lymanka Apartment was purchased for approximately $35,000—although she does not recall the exact amount—and Sewall paid for the Lymanka Apartment, even though it was registered in her name.

40.     Ahead of the contract to purchase the Lymanka Apartment on June 13, 2017, and as set forth above, between June 6 and June 13, 2017 Ohonkova withdrew €40,520—approximately $45,000—from Privat #1464.  Based on the timing and amount of these transfers and withdrawals and Ohonkova's sworn deposition testimony, there is reason to believe that the approximately $45,000 in cash withdrawn from Privat #1464 was used to purchase the Lymanka Apartment.

## Facilitating Banco Popular Account #274068741

41.     Banco Popular de Puerto Rico ("Banco Popular") account 274068741 is a bank account held in the name of Bryant Sewall (Banco #8741).  Between November 2018 and the end of April 2019, Banco #8741 received approximately one million dollars in fraud proceeds from other known accounts holding investor funds.  The following is a more detailed look into the flow of investor funds to Banco #8741.

42.     Between March 2016 and April 2019, Česká spořitelna account #6813272 (Česká #3272), an account held by Blue Isle Markets Inc., received approximately $58.4 million in investor funds.  Approximately $9.1 million of these investor proceeds were transferred to Wells Fargo Bank, N.A. account #2538236486, held by Island Technologies LLC, a holding company owned by Stewart, Sewall, and M.Y. (Island Tech Wells Fargo Account #6486).  Stewart, Sewall, and M.Y. hold signature authority on Island Tech Wells Fargo Account #6486.

43.     Within the same period, Island Tech Wells Fargo Account #6486 transferred a total of approximately $2.5 million in fraud proceeds to Banco Popular account

#030109329, also held by Island Technologies LLC (Island Tech Banco Account #9329). Stewart, Sewall, and M.Y. hold signature authority on Island Tech Banco Account #9329.

44.     Banco #8741 was funded by the following transactions between November 2018 and the end of April 2019:

- Approximately $645,896.00 in fraud proceeds from Island Tech Banco Account #9329;

- Approximately $325,508.20 in fraud proceeds from Island Tech Wells Fargo Account #6486;

- Approximately $29,985.00 in fraud proceeds from Česká #3272. Stewart is a signer on the account.

45.     Between March 2019 and the end of April 2019, as evidenced by wire transfer receipts obtained by U.S. authorities, Banco #8741 transferred approximately $280,120.00 to PJSC PrivatBank account 5168742710582507 held by Ohonkova.

**Facilitating PJSC CB Privatbank Account #5168742710582507**

46.     PrivatBank account #5168742710582507 is a bank account held in Ohonkova's name ("Privat #2507"). Account records provided by the Prosecutor General of Ukraine for Privat #2507 begin with a transaction on March 9, 2018. The account balance for Privat #2507 prior to that transaction was zero. Account records show that every deposit into Privat #2507 before July 2020 was a transfer of funds from accounts held by Sewall.

47.     Between April 12, 2019 and April 26, 2019, Privat #2507 received a total of $278,521.39 of investor funds from Banco #8741.

48.     On April 12, 2019, Privat #2507 received a wire transfer of $253,683.21 from Banco #8741. On April 12, 2019, prior to the transfer of $253,683.21, the account balance for Privat #2507 was $1,985.02.

49.     On April 26, 2019, Privat #2507 received a wire transfer of $24,838.18 from Banco #8741.

50.     No other deposits into Privat #2507 occurred between April 12, 2019 and May 29, 2019.

51.     On May 29, 2019, $255,000 was transferred from Privat #2507 to PrivatBank Account 5218572220832401 (Privat #2401). Privat #2401 is a bank account held in Ohonkova's name.

**Facilitating PJSC CB Privatbank Account #5218572220832401**

52.     Account records provided by the Prosecutor General of Ukraine for Privat #2401 begin with a transaction on June 18, 2019. The balance in Privat #2401 ahead of that first transaction on June 18, 2019 was zero, indicating that all $255,000 transferred into Privat #2401 from Privat #2507 on May 29, 2019 had been withdrawn from Privat #2401 by June 18, 2019.

**Kyiv Apartment**

53.     Ohonkova purchased the Kyiv Apartment on May 30, 2019, which is titled to Ohonkova.

54.     According to Ohonkova's sworn deposition testimony, the Kyiv Apartment was purchased for approximately $250,000—although she does not recall the exact amount—and Sewall paid for the Kyiv Apartment, even though it was registered in her name.

55.     As set forth above, Privat #2507 received $278,521.00 in investor funds between April 12, 2019 and April 26, 2019.   On May 29, 2019, $255,000.00 was transferred from Privat #2507 to Privat #2401.   As of June 18, 2019, Privat #2401's account balance was zero, indicating that the $255,000.00 had been withdrawn from Privat #2401 sometime between May 29 and June 18, 2019.   Based on the timing and amount of these transfers and withdrawals and Ohonkova's sworn deposition testimony, there is reason to believe that the $255,000 withdrawn from Privat #2507 on May 29, 2019 was used to purchase the Kyiv Apartment.

Deputy U.S. Marshal
U.S. Marshal Service