IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 21-cr-00034-WJM-02

UNITED STATES OF AMERICA,

      Plaintiff,

v.

2.     BRYANT EDWIN SEWALL,

      Defendant.

---

## GOVERNMENT'S SENTENCING STATEMENT AS TO DEFENDANT SEWALL

---

Defendants Stewart and Sewall perpetrated a massive fraud, undeterred by the knowledge that they would go to jail if they were caught.[1] Their intention is clearest in their own frantic words, recorded just weeks before the Securities and Exchange Commission discovered and terminated their fraud: "[I]f we go down, you're going with us. And we're all going to try to figure out how to not be in jail," (Defendant Sewall, June 4, 2019, GX 558), and "I'll tell you what... we're on a recorded line so, if... we fucking blow up, it's gonna be fucking bad. It is gonna be bad." (Defendant Stewart, August 5, 2019, GX 562). The defendants began their scheme with the lie that they were expert algorithmic forex traders who had never lost. To maintain that fraudulent pretense and the lucrative scheme it spawned, they lied month after month and year after year about every aspect of their trading program: they lied about sham

---

[1] The substance of the government's sentencing statements for Defendants Stewart and Sewall are largely identical. Because the guideline calculations and sentence recommendations differ, however, the United States submits a separate statement for each defendant.

"audits" purporting to verify their phenomenal trading track record, they lied by providing false account statements hiding their massive trade losses, and they lied by using bogus accounting and trade manipulation to convert investor money into sham "performance fees" and "markups." The brazenness of Defendants' mutual actions is clear in the breadth and depth of the fraud: more than 150 victims whom Defendants scammed into sending over $129 million dollars to them over the course of more than three years, all of whom believed they were making massive profits (many of whom even paid taxes on their gains). There were no profits. At least for the investors. The investors lost but the defendants gained. The defendants spent the profits of their scheme living the Caribbean high life in condos purchased with investor money while maintaining multi-million-dollar residences back home, also bought with other peoples' money.

Defendants Stewart and Sewall were equal partners in the fraud from the beginning. There are two primary differences between them. The first is that Defendant Stewart is essentially a repeat offender. The Mediatrix fraud was little more than a perfected version of a scheme for which he had already been sanctioned by the CFTC years before. The second is that Defendant Stewart's contempt for the law manifested itself in the cynical decision to obstruct justice by giving perjured testimony to the jury. These are both aggravating factors that support a higher sentence for Stewart.

Considering the scope, duration, and serious nature of the Defendants' crimes, the resulting harm caused to more than 150 victims, and their willful disregard for the rule of law, only a substantial prison sentence will serve the demands of justice. Subject to review of the Presentence Investigation Report and consideration of additional victim impact information the government expects to receive prior to sentencing, the United States anticipates that it will

recommend a sentence of not less than 28 years (336 months) of imprisonment (a guideline sentence as currently calculated), the maximum three-year term of supervised release, and restitution to be calculated and presented to the Court prior to sentencing (the "Recommended Sentence").

## I.      Facts Established at Trial

The facts proven at trial establish that the Defendants engaged in a conspiracy to mutually promote their fraudulent forex scheme by lying about every aspect of their operation. They impeded oversight of their knowingly illegal activities through an unnecessarily complex web of entities intended to obfuscate ownership, control, and visibility into their operations. They fabricated records put out by third parties like HedgeAlytix and Grant Thornton to lend legitimacy to their scam. And they manipulated trade execution methods and software (MT4) to perpetuate the fraud and charge fraudulent fees. Every day of their nearly four-year scheme, Defendants made intentional choices to deceive, building an elaborate structure to further and protect their criminal enterprise and their own self-interest.

### A.   Defendants Used Complex and Sophisticated Means to Deceive Investors and Conceal their Massive Fraud

In 2015, after a series of failed business ventures, Defendant Stewart and Michael Young took $500,000 from investors for forex trading through Mediatrix Capital, Inc. and lost all of it. Around that same time, also in 2015, Defendant Sewall convinced his Marine Corps colleagues to allow him to trade forex for them using Sewall's "track record" of "successful" algorithmic trading, and quickly racked up losses wiping out their equity. Defendants' parallel failures were transparent because both worked with brokers that controlled the statement reporting format, showing all open (losing) positions to the Defendants' clients through statements sent directly to

them. From Defendants' mutual failures and lessons learned, they came together to defraud over 150 investors of tens of millions of dollars by controlling every aspect of the forex operation through their offshore "brokerage" firm. Through Blue Isle Markets, Inc., Defendants directly manipulated the statements of profits and losses sent to their clients, converted victim funds to their own use through markup fees, and perpetuated, extended, and concealed the scheme through both mechanisms. Unsatisfied with the millions in markups they charged their clients, however, they also used their ability to manipulate trade execution to falsely report profits to their clients and charge performance fees on those purported gains. Their deceptions were numerous, extensive, and complex.

Defendants' conspiracy began in late 2015, when they entered into a Purchase and Sale Agreement for Mediatrix to acquire Defendant Sewall's "Navigator" algorithm and for him to become an owner of Mediatrix and Blue Isle. *See* GX 152. Defendants agreed upon the primary tool of their fraud at that moment: their false and fabricated track record of success. Defendants agreed to market a fictional track record purportedly based on Sewall's algorithmic trading successes (the "Tallinex" trading), allegedly dating back to 2013 (*see* Testimony of Young, Stewart), even though both Defendants knew Defendant Sewall had lost his clients' money. *See, e.g.*, Testimony of victim J.H. (explaining Sewall offered Tallinex Marines concessions at Mediatrix regarding an adjusted "high water mark" to compensate for their losses from Sewall's trading); GX 313 (Tallinex Marine investor B.H. discussing the same offer with Stewart, noting his prior loss of "20,000ish" dollars). From there, Defendants' misrepresentations multiplied as they sought to constantly bring in more money and to keep investors from trying to get any of it back.

Defendants broadly disseminated false information through marketing materials, their expert salesman Michael Young, "introducing brokers" like Tyler Wood, and deceived investors who believed they were making phenomenal returns. Defendants executed their scheme to defraud through numerous intentional falsehoods and misrepresentations, including:

(1)    **A fabricated track record of successful trading that made it appear as if Defendants had worked together since 2013 on a single algorithmic strategy that never lost.** *See, e.g.*, GX 87 (including HedgeAlytix reports, the "one pager" with track record and performance data, the "Managed FX Fund" Prospectus, "The Mediatrix Capital Story" brochure, and "Due Diligence – Frequently Asked Questions" document, all marketing materials provided to investor S.B.; the materials were updated over time to reflect the "new" fabricated track record of unbroken success, but otherwise substantially similar); GX 209 (2019 promotional brochure provided to investor M.W.). But Mediatrix was not established until 2014 (GX 79), defendants did not join together to market a fabricated performance history until late 2015 (GX 152), and their marketed record of "success" was a complete sham (GX 9). They started with a failed history that they concealed and continued to lose money, digging themselves a massive hole they could never crawl out of.

(2)    **Massively overstated Assets Under Management, advertised to convince investors that Defendants successfully managed a significant amount of capital and their program was steadily growing.** *Compare, e.g.*, GX 134, p.3 & GX 610 (listing AUM as $90 million in December 2017 and $245 million in March 2019), *with* GX 20 (showing maximum AUM at any time during the scheme as $38 million in December 2017); *see also, e.g.*, GX 129 & GX 130 (Defendant Stewart's false representation of assets under management based on

manufactured master account balances, compared to the actual master account statements for the same month, showing massive floating losses).

(3)     **False assurances that Mediatrix's performance figures were "audited," as repeated in their marketing materials and purportedly verified by well-known accounting firms like KPMG and Grant Thornton.** But the "audits" were nothing more than false performance figures fed into third-party tools like HedgeAlytics. *See* Testimony of D. Slavin (explaining CogentHedge and HedgeAlytix reports included performance data provided by Mediatrix). And the alleged "verification" of positive performance history by KPMG and Grant Thornton was a product of Defendants' manipulation. By controlling the "brokerage" but without disclosing that fact to the accounting firms, Defendants concealed the true financial picture of the Mediatrix investments, hid their massive losses, and—just as they did for investors—showed false profits by disclosing only their manipulated client subaccount statements. *See* DX A68 (providing KPMG with only manipulated "MyFxBook" accounts, omitting brokerage statements with 2015 losses, and making false statements about the founding of Blue Isle); GX 334 & GX 683 (sending only subaccount statements to Grant Thornton); GX 340 (Stewart asserting to Grant Thornton that they do not own Blue Isle); GX 365 (Sewall Skype message to Young stating Grant Thornton needs to only do what they were hired to do and stop asking for additional information).

(4)     **False promises that the "balance" on investors' monthly statements was the full, redeemable value of their accounts.** *See, e.g.*, GX 338. In fact, Defendants dug themselves into a hole so deep that at the end of the scheme they had $9.8 million in Blue Isle brokerage accounts but, by their own calculations, owed their clients over $180 million. *Compare* GX 3

(September 2019 coverage account equity for all accounts totaled $9.8 million) & GX 409 (all coverage account statements for September 2019, as reflected in Ex. 3) *with* GX 685 (per Patel testimony, total client account balances owed per Defendants' Strategy Trader system of over $180 million) & GX563 (all active master account statements as of September 2019, per testimony of Equiti employee H. Hasanin, showing "balances" in the hundreds of millions and "floating" losses from fictionally "open" trades also in the hundreds of millions).

(5)     **False representations that Defendants would charge performance fees only when the client made money.** *See, e.g.*, GX 94 (one example of the Disclosure Documents investors were required to sign to invest, identifying performance fees as a percentage of "net new appreciation in the accounts [sic] actual account value"). Defendants charged their clients nearly $30 million in performance fees, *see*, *e.g.*, GX 631, for the privilege of losing money nearly every month of trading, *see* GX 9.

(6)     **Concealment of the massive markup fees Defendants charged through Blue Isle on every trade, win or lose, and the conflict of interest between Mediatrix and Blue Isle.** Although Mediatrix and Blue Isle were owned and operated by the same three individuals, Mediatrix documents did not disclose this. When investors happened to learn of the common ownership, Defendants cultivated the false impression that Blue Isle performed a valuable purpose to "protect" the algorithm and provide "true" (and better) pricing to clients. All false. Blue Isle served no purpose other than to line Defendants' pockets, to the tune of $46 million. *See* GX 364 (PowerBI Dashboard); 380 (Stewart message to Sewall stating employee was running numbers through PowerBI and "shows 46mil total in markup revenue"). By inducing investments and preventing client withdrawals through their false statements, Defendants kept

control of as much margin as possible to allow them to keep trading and keep charging markups. *See, e.g.*, GX 557 (recorded telephone call in which Defendant Sewall explained that a new algorithm he was working on could generate a "million, million two a day in rebates and equity and that has nothing to do with, fortunately for us, it doesn't have to do with the trade execution or whether it makes a penny for our clients").

(7)     **False daily and monthly investor account statements showing monthly profits when, in fact, Defendants consistently lost money.** Defendants used the "hedging" functionality in their master accounts in conjunction with their "closed P&L" reporting system to conceal their substantial trade losses and reported false profits to clients. *See, e.g.*, GX 110, GX 252, GX 153, GX 214, GX 234–GX 238, GX 178, GX 179, GX 830, GX 200, GX 96, GX 636, GX 637 & Testimony of victims D.S. and J.E. (total loss for testifying victims alone equals over $40 million, more than four times the amount of actual money in Blue Isle brokerage accounts as of September 2019).

(8)     **False promises of full transparency and that their clients would see every trade.** *See, e.g.*, GX 95 (Power of Attorney document clients were required to sign to invest, which falsely stated that the broker—Blue Isle—would send a confirmation of "every transaction"). In fact, Defendants concealed closed transactions that lost client money; the majority of trades were not reported to clients at all.

(9)     **Fraudulently pretending to assume a position of private trust between Mediatrix and its clients**. Through the Power of Attorney contracts Defendants required each client to sign, Defendants assured their clients that Mediatrix would act in their "best interest" and "only trade in accordance with Customer's risk capital and risk appetite instructions and will

not churn the Account in order to receive higher commissions and fees." *See* Power of Attorney forms (e.g., GX 95), p. 2. Defendants also falsely asserted that Mediatrix was not "authorized to instruct the withdrawal of any money, securities, collateral or any other asset in the name of the Customer." *Id.* Each investor at trial testified that they signed a Power of Attorney form. These contractual promises establishing a position of trust between Defendants and the investors were false. Defendants acted in their *own* interests and against client interests, used their control of Blue Isle to churn the accounts to generate markups regardless of the profit or loss of their clients, and did with client money as they wished (keeping money instead of forwarding it to brokerage accounts and withdrawing funds from the brokerage account for their own purposes, including the purchase of Defendant Sewall's multi-million-dollar Texas property).

(10)   **False assurances that client funds were held in separately managed accounts in their own names with the brokerage, Divisa/Equiti.** *See, e.g.*, Testimony of victim L.H.; Testimony of victim R.P; GX 174 (diagram falsely stating client funds were held in client subaccounts within an "omnibus" account at Wells Fargo UK or BNP Paribas/Barclays). In fact, all of the client money was either in Blue Isle bank accounts (for Defendants to spend) or pooled into Blue Isle brokerage accounts at Divisa/Equiti.

(11)   **Inflated and misleading information of Defendants' purported professional successes and concealment of their past failures.** Defendant Sewall held himself out as a successful "hedge fund manager" in his civilian job to his Marine colleagues (Testimony of victim J.H.) and touted his "expertise" and "successful trading algorithms" to investors (*see* GX 94 (Disclosure Documents)), though he was nothing more than a failed trader. Defendant Stewart intentionally concealed and falsely misrepresented the facts regarding his prior involvement in a

scheme disrupted by the CFTC. The conduct for which he was sanctioned by the CFTC tracked the same fraudulent means he used to complete this scheme: showing investors false statements of fabricated trading successes (GX 30, p. 10), fabricating a track record of success going back many years before the company existed (GX 30, pp. 6, 8), and touting "a proven record of high success" with the ability to "limit our losses" (GX 30, p.6). Defendant Sewall knew this and was complicit in that concealment. GX 325 (messages between Young and Defendant Sewall, with Sewall stating "anyone who holds stewarts [sic] issue from 25 years ago as a problem can hit the road . . . that is just stupid, series 3 and shit is worthless; just a way for the Fed to control you"). Nevertheless, Defendants advertised Defendant Stewart's success as a currency trading educator, the architect of a "famed short term Spot FX Currency Cycles and Correlation methodology" he purported to use at Mediatrix "daily," and the generator of an "outstanding track record" at Mediatrix. *See, e.g.*, GX 94 (Disclosure Documents containing Defendants' biographies).

### B. Defendants Used Multiple Mechanisms to Perpetuate and Conceal the Fraud

To ensure their lies remained unchallenged and their scheme could continue, Defendants affirmatively avoided detection through multiple means. One primary method was the manipulation of their business partner and marketer, Michael Young. Mr. Young certainly knew about the false history of "Mediatrix's" success and concealment of the Mediatrix trading losses from 2015. He concealed those losses from investors and falsely represented that Mediatrix had a positive trading history dating back to 2013. But with respect to the ongoing performance of the Mediatrix forex program, Defendants intentionally lied to Young about the purported success of the trading—making sure he had no independent access to the trading records or those who knew about the trading (like Equiti representatives)—so he would use the impressive marketing skills

they knew he had to bring in more money. *See*, e.g., GX 129 & GX 130 (showing actual master account statements with massive "floating" losses as compared to statements Defendant Stewart created, which Stewart provided to potential investors and Young); GX 368 (Sewall Skype message to Young touting track record of success just months before the SEC terminated the scheme and while telling Equiti employees they were all going to have to figure out how to stay out of jail (GX 558)); GX 779 (Defendants' discussion regarding plans to prevent Young from meeting with Equiti employees in London).

Defendants operated the scheme outside the United States in multiple foreign jurisdictions, impeding the monitoring and investigation of Defendants' efforts to defraud American investors. Mediatrix Capital Inc. was registered in Belize, and the Mediatrix Capital Fund was established in the Bahamas. GX 451, GX 452, GX 450. Blue Isle was registered in St. Vincent and the Grenadines and operated out of the Bahamas. GX 84, GX 111, Testimony of Young. Defendants further obscured the ownership structure of Blue Isle by incorporating Island Technologies LLC in Puerto Rico, which they made the 100% owner of Blue Isle Markets, Inc. and by holding their respective ownership interests in Island Technologies through obscure trusts formed in the Cook Islands in November 2018. Defendants traded using brokerage firms—Equiti and Advanced Markets—located in Armenia, the UK, and the UAE. *See* GX 83. They used bank accounts for Mediatrix and Blue Isle bank located outside the United States. *See* GX 461– GX 468 (account opening documents for Ceska Sporitelna accounts, located in the Czech Republic); GX 473 (account opening documents Global Fidelity Bank account, located in the Cayman Islands); GX 478 (account opening documents for Kiwibank account, located in New Zealand); GX 509 (account opening documents for ANZ Bank account, located in New Zealand).

### C.  Defendants Organized the Criminal Enterprise as Equal Partners and Shared Responsibility for its Operations

Defendants had a division of labor but were equal partners in the criminal conspiracy. Defendant Stewart ran Mediatrix, managed the banking, handled investor communications, kept abreast of the increasingly inflated track record, accounted for the fees Mediatrix and Blue Isle fraudulently charged, and directed distributions to himself and his partners. He supervised and directed the accountant (Patrick Parham), the "Chief Compliance Officer" (Brian King), and the employee responsible for sending out performance fee statements (Aaron Stewart), and he paid the introducing brokers. While his role was to handle more of the "administrative" issues, he was also a daily participant in trading and the brokerage relationship. Defendant Stewart himself testified that he spoke to Gary Dennison 10 to 15 times per day by the time they were six months into working with Divisa/Equiti. *See* Testimony of Stewart. Defendant Stewart's recorded calls reveal his detailed knowledge of the trading details, including their limits and their trading losses.

Defendant Sewall was responsible for conducting most of the trading. Defendant Sewall's Skype messages show his daily interaction with Equiti representatives to manage the brokerage accounts, staying below the limits imposed by the brokerage so he and Stewart could keep trading and "hedging" to manipulate the flow of information to his clients. Defendant Sewall managed and directed the programmer they hired to create a new trading software, Guarav Patel, and he was the primary trading contact with Divisa/Equiti. But like Stewart, he also had his fingers on the pulse of the operations his partner primarily handled, staying in the know on the "audits" by Grant Thornton, tracking client redemptions, and client account reporting. *See, e.g.*, GX 365 (WhatsApp conversation between Sewall and Young in which

Sewall complains about auditors seeking additional information); GX 798 (Stewart and Sewall WhatsApp conversation in regarding client redemptions of $3 million and need to close trades to show profits then "rehedge" them to calm investors and covering the topic of limited closed trades in newsletters to clients); GX 377 & GX 378 (Stewart and Sewall WhatsApp messages regarding negative client statements).

The end goal was the Defendants' own profit, which they shoveled into their own pockets while digging holes for their victim investors. Of the approximately $129 million Defendants took from investors, they forwarded only approximately $75 million to the Blue Isle brokerage accounts at Equiti, retaining approximately $53 million in their bank accounts for their own use. *See* GX 14, GX 23. Unable to withdraw funds that didn't actually exist in brokerage accounts, Defendants used the fiction of "P&L swaps" to enrich themselves. Defendants claimed to transfer some of their "own" company money ("earned" through the superfluous and fraudulent Blue Isle markup fees and allegedly sitting in the "balance" in "house" master accounts) into client subaccounts to represent the money they took from clients but never actually forwarded to Equiti. *See* Testimony of Young, Stewart. But this was all Monopoly money—nothing more than fictional, paper entries derived from inflated master account statements reflecting false profits that had long ago been offset by realized losses from actual closed trades. *Compare* GX 3 (September 2019 coverage account equity for all accounts totaled $9.8 million) & GX 409 (all coverage account statements for September 2019, as reflected in Ex. 3) *with* GX 563 (all active master account statements as of September 2019, showing "balances" in the hundreds of millions and "floating" losses from fictionally "open" trades also in the hundreds of million) & GX 685

(per Patel testimony, total client account balances owed per Defendants' Strategy Trader system of over $180 million).

The loss from Defendants' scheme is the total amount they took from victims, less initial investment amounts returned to investors. This total exceeds $90 million. *See* GX 14 (approximately $129 million taken, less approximately $39 million returned to investors ($37.5 million returned from Blue Isle/Mediatrix Accounts (blue box) and approximately $1.395 million returned from an Island Technologies account (included in the Young/Stewart/Sewall entities yellow box)). Because Defendants paid redeeming investors the "balances" on the clients' subaccount statements (reflecting false profits), the accurate loss amount should deduct the false profits paid to these redeeming clients. The United States will provide a specific calculation of the amount owed to each victim in this case prior to sentencing for restitution purposes, which total will equal actual loss. In any case, the loss will not exceed $150 million, and thus falls firmly within the range of $65 to $150 million set forth in § 2B1.1(b)(1).

## II.   Sentencing Guideline Calculation and Discussion of Applicable Sentencing Enhancements

### A.  Sentencing Guideline Calculation

Pursuant to U.S. Sentencing Guideline Section 3D1.2(d), the convictions for wire fraud (Counts 1 through 14) and conspiracy to commit wire fraud (Count 15) group, and the relevant guidelines section is 2B1.1.

1.   The base guideline is § 2B1.1, with a base offense level of 7. U.S.S.G. § 2B1.1(a)(1).

2.   A 24-level enhancement applies because the loss is more than $65,000,000 but less than $150,000,000. *Id.* § 2B1.1(b)(1)(M).

3.  At minimum, a two-level enhancement applies because the offense involved ten or more victims and resulted in substantial financial hardship to one or more victims (victim M.W., who testified at trial that he lost more than half of his retirement income). *Id.* § 2B1.1(b)(2)(A)(i), (iii); *see also* Application Note 4(F)(iii) & (iv). Additional evidence may be received from victims prior to sentencing that could increase the identified number of victims who experienced substantial financial harm, potentially increasing this enhancement.

4.  A two-level enhancement applies because a substantial part of the fraudulent scheme was committed from outside the United States, and because the offense involved sophisticated means and the Defendant intentionally engaged in or caused the conduct constituting sophisticated means. *Id.* § 2B1.1(b)(10)(B) & (C).

5.  A four-level enhancement applies for leading and organizing an extensive scheme. *Id.* § 3B1.1(a).

6.  A two-level enhancement applies because the Defendant abused a position of private trust in a manner that significantly facilitated the commission and concealment of the offense. *Id.* § 3B1.3.

7.  The adjusted offense level is at least 41.

8.  Based on information currently available to the United States, it is estimated that the defendant's criminal history category is I.

9.  The career offender/criminal livelihood/armed career criminal adjustments would not apply.

10. The zero-point offender reduction would not apply. The defendant was an

organizer or leader of the scheme. *See* U.S.S.G. § 4C1.1(a)(10); *United States v. Mahee*, 2023 WL 8452433, *3–4 (N.D. Ga. Dec. 6, 2023) ("No defendant who receives an Aggravating Role Adjustment under § 3B1.1 of the Guidelines can ever be eligible for the Zero-Point Offender Adjustment under § 4C1.1(a)."); *United States v. Gordon*, 2023 WL 8601494, at *3 (D. Maine, Dec. 12, 2023). He also personally caused substantial financial hardship. *See* U.S.S.G. § 4C1.1(a)(6).

11.    The advisory guideline range resulting from these calculations is 324 to 405 months.

12.    Pursuant to guideline § 5E1.2, assuming the estimated offense level above, the fine range for this offense would be $50,000 to $500,000, plus applicable interest and penalties.

13.    Pursuant to guideline § 5D1.2, if the Court imposes a term of supervised release, that term is at least one year, but not more than three years.

14.    Pursuant to guideline § 5E1.1(a)(1), the Court shall enter a restitution order for the full amount of the victims' losses. The United States will submit a supplemental statement in advance of the sentencing hearing with a restitution calculation for all victims.

**B.   Applicable Sentencing Enhancements**

   **1.   § 2B1.1(b)(10): Defendants used sophisticated means to execute the scheme.**

Defendants engaged in sophisticated means by (1) locating the various entities that they used to execute the scheme in multiple different offshore jurisdictions and (2) through their creation, control, and use of their sham "brokerage" entity, Blue Isle. Blue Isle served no

16

legitimate function. Rather, Defendants used Blue Isle to shield their fraud from investors and accounting firms hired to "verify" performance results, preventing both from having direct access to actual trading accounts and complete information about the performance of the investments. Defendants used Blue Isle to manipulate the trade data provided to their clients, using their knowledge of the discrepancy between trade execution functionality in the master accounts (which "allowed" "hedging") and the coverage accounts (which did not, closing "hedged" trades) to stay within the brokerage-imposed limits and enable continued trading while hiding the losses from those closed trades from defendants. *See* GX 551; GX 574; *see also generally* GX 700, GX 774 & GX 775 (Skype logs and WhatsApp messages between defendants and brokerage employees including showing defendants' understanding and use of "hedge" functionality to close trades necessary to stay within limits and continue trading). Using Blue Isle to manipulate client statements to falsely report profits also allowed Defendants to charge the performance fees of nearly $30 million. Defendants also used Blue Isle as an engine of the fraud, converting investor funds to their own use by charging "brokerage" fees for meaningless "hedged" trades, and using money to conduct their trading that investors would have never sent in the first place or would have withdrawn had Defendants provided truthful information about their forex trading.

    **2.  § 3B1.1: Defendants were both leaders and organizers of an "otherwise extensive" scheme.**

       *a.  The scheme was extensive.*

In determining whether a scheme is otherwise extensive, the Court must examine "the totality of the circumstances, including not only the number of participants but also the width, breadth, scope, complexity, and duration of the scheme." *United States v. Yarnell*, 129 F.3d

1127, 1139 (10th Cir. 1997). The Court may consider the use of "unwitting outsiders," as well as the number of participants, in determining whether the criminal enterprise is "extensive." *Id.*

Here, Defendants engaged in a complex conspiratorial scheme for nearly four years (December 2015 through September 2019) and took $129 million from more than 150 victims, over $90 million of which they did not return. Defendants' scheme was complex, involving creation of a sham brokerage, the manipulation of forex trade execution methods and reporting technology to conceal and perpetuate the scheme, and the creation of false third-party reports from accounting firms to "verify" their alleged success. The scope of their deceit was far ranging: Defendants provided false and fraudulent information to investors on nearly every aspect of their business and performance, lied to professional auditors, and deceived their business partners.

Defendants used the services of many (some unwitting, others more complicit) to accomplish the scheme, including: Michael Young, marketer extraordinaire; Tyler Wood and other introducing brokers who solicited victims to the program using Defendants' false and fraudulent misrepresentations; Guarav Patel, the programmer hired to create an MT4 substitute that would have the same functionality as MT4, including closed P&L reporting and hedging ability; Gary Dennison and other Equiti brokerage employees; Aaron Stewart, who calculated and sent out performance fee statements each month; Brian King, the "Chief Compliance Officer," featured in marketing materials and copied on e-mails to give the appearance of legitimacy; and the Advanced Markets brokerage.

### b. Defendants were both leaders and organizers.

"There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S.S.G. § 3B1.1 Application Note 4; *see also United States v. Wardell*, 591 F.3d 1279, 1305 (10th Cir. 2009). "The key to determining whether a defendant qualifies as an organizer is not direct control but relative responsibility." *United States v. Wardell*, 591 F.3d at 1304 (quotation omitted). Defendants Stewart and Sewall each had their own areas of responsibility within the conspiracy, but they were equal partners who worked together to ensure the success of the scheme and to share equally in the fraudulent proceeds.

Defendant Stewart managed "operations" of Mediatrix, including all banking and finance, partner "distributions", investor communications, performance fee calculations, and monthly investor statements. He also participated in trading through negotiation of credit limits and other issues with Equiti. Defendant Sewall ran the trading side of the operation—testing and adjusting algorithms, manually trading, ensuring conformity with the broker-imposed limits, and manipulated trades to hide losses. But he also stayed in the know on investor communications, Grant Thornton issues, client redemption requests, and the like.

Among the factors a sentencing court should consider when determining whether to apply an aggravating role enhancement are:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 Application Note 4.

Both Defendants shared decision making authority, participated extensively (though with their focus on separate areas of the scheme) in the operation of the fraud, and shared equally in the proceeds. *See* GX 795 (message from Sewall to Young explaining that "operations is ours"); GX 339 (e-mail from Stewart to Young in which he proclaims "I run this company!" and "Bryant runs the trading"); GX 173 (describing authority of Stewart and Sewall as "absolute"). They planned each aspect of the scheme together and each supervised employees falling within their area of responsibility—Stewart the administrative-type employees like the "Chief Compliance Officer" and the accountant, Sewall the programmer brought on to create a new trading program and the guy they hired to stay up at night to stare at MT4 in case something happened with the trading.

The Tenth Circuit has recognized that "a defendant may be punished as an organizer under § 3B1.1(c) for devising a criminal scheme, providing the wherewithal to accomplish the criminal objective, and coordinating and overseeing the implementation of the conspiracy even though the defendant may not have any hierarchical control over the other participants." *United States v. Valdez-Arieta*, 127 F.3d 1267, 1272 (10th Cir. 1997). Thus, "[t]he key to determining whether a defendant qualifies as an organizer is not direct control but relative responsibility." *Wardell*, 591 F.3d at 1304 (quotation omitted); *see also United States v. Damato*, 672 F.3d 832, 847 (10th Cir. 2012) ("A defendant may be eligible for the leader or organizer enhancement if he leads or organizes even one other participant."). Here, defendants equally shared in the responsibility for the criminal enterprise, and both are leaders and organizers of the scheme.

### 3.  § 3B1.3: Defendants Abused a Position of Private Trust

Defendants assumed a position of private trust through their Power of Attorney relationship with each of their investors. *See, e.g.*, GX 95. Defendants promised each investor to act in their best interests, including their agreement not to "churn" accounts and their representation that Mediatrix had no direct access to client funds. These were all lies, and Defendants breached their positions of trust by acting solely in their *own* interests. *See United States v. Koehn*, 74 F.3d 199, 201 (10th Cir. 1996) (explaining that the "primary concern of § 3B1.3 is to penalize defendants who take advantage of a position that provides them freedom to commit or conceal a difficult-to-detect wrong.").

### III.    Analysis of the Sentencing Factors

At sentencing, the Court must calculate the sentencing range recommended by the United States Sentencing Guidelines and consider the sentencing factors set forth in 18 U.S.C. § 3553(a). *See United States v. Barnes*, 890 F.3d 910, 915 (10th Cir. 2018). The starting point is the guidelines, which in this case are quite high. But considering the statutory sentencing factors—in particular the serious nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to reflect the seriousness of the crimes and deter future criminal conduct—a sentence reflecting the consequential nature of the crime as communicated by the guidelines is a rational and just result.

### A.    Nature and Circumstances of the Offenses

Defendants' crimes were calculated, sophisticated, extensive, and repeated. This was not an isolated error in judgment, but a series of intentional choices to exploit others for personal gain through every manner of misrepresentation Defendants could conjure in support of the

fraud. The magnitude of the fraud represents one of the most significant fraud convictions in this District in recent history. But it's not just about the money. Defendants engaged in intentional deceit towards their investors, regulators, and outside third parties in almost every possible way they could.

**B.      Defendant's History and Characteristics Support the Recommended Sentence**

Defendant Sewall has no conduct in his history to make him a repeat offender as Defendant Stewart does, and he made the wise decision not to try to sway the jury with additional falsehoods. Based on the information available to the government at this time, these two factors are the sole basis to distinguish Defendants.

While Defendant Sewall lacks some of the aggravating personal history factors present for Defendant Stewart, it remains the case that his own history contributed to the calculated nature of this offense. He was a poor trader with a comprehensive understanding of the consequences of full disclosure to his clients. He contrived to avoid that mistake in future by scheming with Defendant Stewart to hide reality through their complete control of the "brokerage" entity. Defendant Sewall has no criminal history and no record of sanctions, but his past demonstrates his clear criminal intent in this case.

The defendant also took advantage of his status as a former Marine officer to whom others would show deference. He targeted fellow Marines to start up his fraud and then used the high esteem in which our country holds its military servicemembers to lend legitimacy to claims that otherwise might have been easily discounted or dismissed. His cynical manipulation of his military service to advance the fraud deserves special consideration. The defendant does not

deserve a sentence as high as Stewart's. But neither does he deserve a sentence at the very bottom of the guideline range.

### C.     The Recommended Sentence is Necessary to Promote Respect for the Law and Provide Just Punishment for Defendant's Crimes

The evidence shows in the Defendant's own words that he knew he was breaking the law. As long as he did not get caught, he just didn't care. White collar criminals often view the risk of apprehension as simply the cost of doing business, while their criminal activity is attributed to the complexity of investing or the difficulties of running a business. There must be serious consequences for the brazen, repeated, extensive frauds Defendants engaged in every day to benefit themselves at the expense of their clients. They did not make a rash decision under the stress of a dramatic, unexpected event. Defendants calculated, conspired, and considered each action, making repeated choices commit their crimes. *Cf. United States v. Stefonek*, 179 F.3d 1030, 1038 (10th Cir. 1999) ("Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.").

It is also important that the Court send a message that protection of the markets and the investing public generally is important. Defendants like this victimize not only the clients whose money they stole but the citizenry's faith in investment opportunities and the ability of market regulators to protect their interests. Crimes like the Defendants' corrode markets and devalue public trust in financial systems.

D.     **General and Specific Deterrence are Critical Objectives of the Sentence in this Case**

The need for general deterrence is paramount for white collar cases. *See United States v. Sample*, 901 F.3d 1196, 1200 (10th Cir. 2018) (recognizing that "[d]efendants in white-collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment" (quoting *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013)); *United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (quoting *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013)). Only a significant term of imprisonment will prevent this type of crime from recurring generally, isolate this Defendant from the opportunity to reoffend, and ensure the Defendant has no desire to do so.

## CONCLUSION

Defendants committed one of the most significant frauds the District has seen. Their sentence should reflect the scope of the crime and damage it caused and should deter this Defendant and any other "businessperson" who would consider deception as a means to profit. While the government will carefully consider the Presentence Investigation Report, all victim impact evidence, and the Defendants' positions, based on the information currently available the United States anticipates recommending a sentence of not less than 28 years (336 months) of imprisonment. This is a guideline sentence that recognizes the relative differences between Defendant Sewall's and Stewart's personal history and acknowledges the significance of Defendant Stewart's decision to provide false testimony under oath. The government also

recognizes that the Recommended Sentence is substantial, but it is necessary to achieve the

statutory sentencing objectives as detailed above.

Respectfully submitted this 17th day of June, 2024.


MATTHEW T. KIRSCH
Acting United States Attorney

By:    */s/ Anna Edgar*               By:    */s/ Bryan Fields*
Anna Edgar                             Bryan Fields
Assistant United States Attorney       Assistant United States Attorney
U.S. Attorney's Office                 U.S. Attorney's Office
1801 California St. Suite 1600         1801 California St. Suite 1600
Denver, CO 80202                       Denver, CO 80202
(303) 454-0100                         (303) 454-0100
Anna. Edgar@usdoj.gov                  Bryan.Fields3@usdoj.gov
Attorney for the United States         Attorney for the United States

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2024, I electronically filed the foregoing **GOVERNMENT'S SENTENCING STATEMENT AS TO DEFENDANT SEWALL** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all e-mail addresses of record.

By:  _/s/ Melanie LeaRussa_
Melanie LeaRussa
Legal Assistant
United States Attorney's Office